City of Pittsburgh, a City of the Second Class, and Marion K. Finkelhor and Ralph Lynch, Jr., individually as consumers *v.* Milk Marketing Board of the Commonwealth of Pennsylvania.

Argued December 7, 1970, before President Judge BOWMAN and Judges CRUMLISH, JR., KRAMER, WILKINSON, JR., MANDERINO, MENCER and BARBIERI (who has since been appointed to the Supreme Court of Pennsylvania and did not participate in the decision).

*Marion K. Finkelhor*, Assistant City Solicitor, with him *Ralph Lynch, Jr.*, City Solicitor, for appellant.

*Charles M. Guthrie*, Assistant Attorney General, for appellee.

*Willis F. Daniels*, with him *Daniels and Swope*, for intervenors.

OPINION BY JUDGE KRAMER, March 5, 1971:

This is an appeal by the City of Pittsburgh and two individuals* as consumers from an adjudication and General Order No. A-762 dated September 3, 1970 (which became effective September 14, 1970), issued by the Milk Marketing Board of the Commonwealth of Pennsylvania (Board).

This order, which set the minimum prices for certain milk products regulated by the Board and which affects a population of approximately three million people in western Pennsylvania in Milk Marketing Area No. 7 (comprising 10 western Pennsylvania counties in their entirety and three counties partially), came as a result of the filing of a petition on May 11, 1970, by 27 dairy dealers (which companies comprise the Greater Pittsburgh Dairy Association) seeking an increase in the price of regulated milk and dairy products.

Apparently there are a total of about 80** dairy dealers in the new Southwestern Milk Marketing Area No. 7, and during the year 1969 they had "net sales" in the amount of $174,165,975.

The City argues that the Board's General Order No. A-762 is invalid, illegal, arbitrary, and contrary to law and that the Board's adjudication was an abuse of the Board's discretionary power, in that (1) the Board failed to carry out its duty to consider all the evidence presented and available; (2) the Board refused to permit the introduction of evidence on consumer prices in other market areas and refused any cross-examination on such matters; (3) the Board's findings and the rec-

---

* The City Solicitor and Assistant City Solicitor of the City of Pittsburgh.

** The record is not clear as to the total number of dairy dealers in the new Area No. 7. Even the Executive Secretary of the Board was not certain of the number, which, according to the record, could be anywhere from 80 to 107.

ord as submitted failed to support the margin of profit realized by certain stores which sell more than four hundred quarts per single delivery; and (4) the Board failed to establish a uniform system of accounts as required by the statute (31 P.S. 700j-704), and therefore the findings of the Board cannot be sustained on the record.

The Board (which became the appellee on appeal), together with the dairy dealers (which became intervenors on appeal), argue that the record does support the findings of the Board and that the entire proceedings together with General Order No. A-762 are in compliance with the law.

With the exception of a special increase in the wholesale discount rate (Official General Order No. A-753, effective June 1, 1970), the last overall order affecting the resale and producer prices of milk immediately preceding the order in question in this case was General Order A-725, which became effective October 15, 1969 (some seven months prior to the petition requesting another increase in milk prices in this case).

The effect of General Order No. A-762 is (among other price increases) to increase the price of Class 1 milk two cents per quart, four cents per half-gallon, and eight cents per gallon on both out-of-store* and retail-home-delivery purchases so that the new prices of milk for retail (home delivery) milk will be thirty-six cents per quart, sixty-nine cents per half-gallon, and $1.34 per gallon, and for out-of-store purchases will be 35 cents per quart, 65 cents per half-gallon, and $1.26 per gallon.

---

* In the parlance of the milk industry, "out-of-store" or "cash and carry" purchases are those made by a customer in a retail store. "Wholesale" or "in-store" purchases are those made by the store from a supplier, usually a dairy dealer. "Retail" or "home-delivery" purchases are those made by the customer when delivery is made, usually at his home.

These increases, according to the Commission's finding, will increase the cost of milk $7,838,894 annually for those who purchase milk from the 30 dairy dealers who were used for the statistical support for the findings of the Commission. In view of the fact that the record shows these dealers represent 70.9% (on a pounds of milk basis*) of the sales in Area No. 7, the consumers in the entire Area No. 7, from all dealers, will have their cost of milk increased about $11,000,000 per year. The order also increases producer prices to align them with the Federal Marketing Order No. 36.

The constitutionality of the Pennsylvania milk regulation statutes has been tested and is well settled. The courts consistently have held them to be constitutional. *Colteryahn Dairy v. Milk Control Commission,* 332 Pa. 15, 1 A. 2d 775 (1938), *Milk Control Commission v. Eisenberg,* 306 U.S. 3, 46, 83 L. ed. 752 (1939), *Penn Dairies, Inc. v. Milk Control Commission,* 318 U.S. 261, 87 L. ed. 748 (1943), *Milk Control Commission v. Lily-Penn Food Stores, Inc.,* 434 Pa. 189, 253 A. 2d 630 (1969).

The Milk Marketing Law (Act of April 28, 1937, P. L. 417, as amended by the Act of July 31, 1968, P. L. , No. 294, 31 P.S. 700j-101 et seq.) at Section 906 (31 P.S. 700j-906) sets down the guidelines for the scope of inquiry by this Court, where it states: "Upon any appeal the court shall determine whether or not the order appealed from is reasonable and in conformity with law. The appellant shall have the burden of proving that an order of the board is unreasonable or illegal. If the court shall determine that the order is unreasonable or illegal, it shall remit the case to the board with directions to reform the findings or order, or to revoke the order, in accordance with the court's

---

* There is no comparable percentage on a dollar basis anywhere in the record.

opinion." The Pennsylvania Supreme Court in the case of *Milk Control Commission of Pennsylvania v. United Retail Grocers Association, et al.,* 361 Pa. 221, 226, 64 A. 2d 818, 820 (1949) in referring to identical language in the original act (Act of April 28, 1937, P. L. 417), sheds further light on the scope of review when it said: "The sufficiency of evidence presented before the Commission for the purpose of inducing a decision that fair return to producers or dealers, as the case may be, requires a revision of established minimum prices or markups, is a matter for the exercise of judgment by the Commission, in the first instance, and its conclusion may not be disturbed unless it has capriciously refused to consider items that should have been entertained, or has entertained items that should not have been entertained, or has not given that weight to the evidence which due process requires." We recognize that the statute has vested authority in the Board to determine technical matters, and that in carrying out this determination it is necessary for the Board to exercise discretion in making its adjudication. It may happen that the exercise of that discretion will be difficult and not to the liking of many persons. However, even though the reviewing court might have chosen a different application, it should overturn the adjudication of the Board only for a clear abuse of discretion or an error of law. It is the duty of this Court to determine whether the Board in fixing milk prices in this case has considered those factors which are essential to sustain the validity of the Board's order. With these guidelines in mind, we believe that the record in this case discloses a clear abuse of discretion.

Before getting to the issues on which this Court must rule, we feel compelled to mention the Board's view of its function vis-a-vis the persons who purchase and consume milk, because that view is relevant to a

test of the Board's exercise of its discretion. The Board in its brief observed: "The Board is aware that the consumer is disorganized, uninformed, and in the main, too disinterested or dispersed to participate effectively in price hearings conducted by the Board. On the other hand, the *Board submits that the legislation under which it performs its functions, does not provide it adequate tools or authority to present the 'consumer's cause' in any substantial fashion.* The Board is also aware that [it] has become quite popular and the current vogue to espouse the 'consumer's cause.' There are numerous persons and organizations extant in this Commonwealth who lay claim to this worthy purpose, but we must admit that the Board has seen little result from their efforts beyond numerous cries of outrage in the mass media. However, the Legislature did not create the Milk Marketing Board to function in accordance with editorial comment and press releases." (Emphasis added)

This statement together with Board counsel's argument that the absence of members of the consuming public as protestants at the Board's hearings somehow supports an increase in the price of milk, invite the inference that the consumers' interests received scant consideration in these proceedings. In a determination of whether the consumers were entitled to more, we must examine the statute.

In referring to the statute, we note that, in the first section pertaining to milk control, the legislative purpose reads as follows: "In the exercise of police power of the Commonwealth, it is hereby declared that the production, transportation, manufacture, processing, storage, distribution, and sale of milk in the Commonwealth is a business affecting the *public* health and affected with a *public* interest, and it is hereby declared that this act shall be and is hereby enacted for the pur-

pose of regulating and controlling the milk industry in this Commonwealth, for the protection of the *public* health and welfare and for the prevention of fraud. Act of April 28, 1937, P. L. 417, Art. I, §101." 31 P.S. 700j-101. (Emphasis added)

In 1968 the title of the Milk Control Law of 1937 was changed to "Milk Marketing Law", Act of July 31, 1968, P. L.    . The purpose clause remained the same.

In Section 801 of the Act (31 P.S. 700j-801), which is the price fixing section, the Legislature reiterates its legislative intent on the subject of protection to the public, wherein it says, "The board . . . shall ascertain and maintain such prices for milk in the respective milk marketing areas as will be most beneficial to the public interest . . ."

In addition, the Legislature says in that same section, "The board . . . shall . . . maintain such prices . . . as . . . will best protect the milk industry of the Commonwealth and insure a sufficient quantity of pure and wholesome milk to inhabitants of the Commonwealth, having special regard to the health and welfare of children residing therein." This same section directs the Board to set prices upon "all conditions" which will yield a reasonable return to the producer, at not less than the cost of production, and a reasonable return to the milk dealer or handler. We find nothing in the Act nor in the reported cases which support the proposition that anyone should receive any kind of preference over anyone else, or that there is no "authority" to protect the consumer's cause.

From a reading of the statute, therefore, it is possible to break down the legislative purpose of milk price regulations in this state into three categories, each of which is entitled to equal consideration, as follows: (1) the producers of milk, (2) the transporters, proces-

sers, and sellers of dairy products, and (3) the consuming public. The Board's implication to the contrary notwithstanding, the interest of the consuming public is entitled to the same consideration as those of the other two categories. We recognize that balancing the interests of each of these parties may require a delicate hand; however, the Legislature clearly intended that all three be given equal consideration insofar as is reasonably possible.

It is not within the purview of this Court to make the decision on whether or not there should be *any* regulation of the dairy industry. Only the Legislature can do that, and it has consistently been the sense of that deliberative body to continue the regulation. Once that decision is made for us there must be compliance within the full meaning of the legislative intent. Halfway measures are not compliance.

### PROCEDURE

In this case an organization representing twenty-seven dairy dealers filed a Petition requesting an increase in prices. Normally, and under the Board's rules, they should have been required to go forward at the hearing to support their petition.

This was not done. Instead, the Board directed that its own witness (its Executive-Secretary) be called first. He was asked a total of twelve questions concerning (1) his identification, (2) the identification of his (including his staff) summary exhibit, and (3) the identification of the thirty dairy dealers chosen for his exhibit. He was not called upon to explain the details of his exhibit which ultimately was the basis upon which the Board made its findings.

Rather, the Board then permitted the dairy dealers' counsel to cross-examine this Board's staff witness, over

the objections of the City, for the obvious purpose of attempting to permit the petitioners to support their case through him. The City also interrogated the Board's staff witness. Only thereafter did the dairy dealers present their evidence and testimony, which did not specifically relate to the main accounting exhibit.

The procedure used in this case was improper in a number of particulars. We cannot understand how the Board's staff could make a recommendation on costs of service and prices without first hearing the petitioners' case. It is only after hearing, examining, and weighing the petitioners' case that the staff of the Board can make an evaluation and recommendations to its Board. It was improper for the Board's staff to prejudge the petitioners' case. It could happen in a hearing such as this that the Board's staff may want to revise its studies and recommendations, and this it cannot do under the procedure used in this case. This is not to say that calling witnesses out of order may not be proper, but rather that an administrative agency should not put itself in the partisan position of proving the case for those parties carrying the burden of proof.

### Statistical Clarity

Any time a regulatory agency is called upon to set prices, rates, costs, or profits for a regulated company (or industry) it can do so only with statistics which have meaning and applicability. Usually this is done through a study of the total operations of the regulated company or companies over a test period. All test period statistics are the actual operation figures adjusted for known changes. Next, where the company is engaged in both regulated and nonregulated operations, it is necessary to break down the total test period reve-

nue and expense figures into the number of operations involved. After determining the jurisdictional dollars of revenues, expenses, and facilities, the agency can determine if the company is entitled to any increase in regulated prices by utilizing this information together with all of the evidence presented.

Any competent accountant familiar with the regulated business can determine the accounting methods which will give the Board a reasonably accurate guide to fixing prices within the statute. Whether the approach ought to be dollars, pounds of milk, or labor is realistically only a matter of what can stand the test of scrutiny and reasonableness under our administrative law procedures. So long as the agency has a record to support what it has done in its findings and conclusions, which permits a reviewing court to determine whether it has abused its discretion or committed an error of law, the courts should not interfere. But when an agency fails to carry out its obligations under the statute, the reviewing court has a duty to interfere.

We are well aware of the oft-quoted passages of Chief Justice KEPHART in *Colteryahn Dairy v. Milk Control Commission,* 332 Pa. 15, 1 A. 2d 775 (1938), that in Pennsylvania milk regulation, allocations and separations are not used; but a careful reading of *Colteryahn* indicates that the Court there was referring more to allocations by class of milk purchased from the producers, than to all phases of the industry, and was based upon the then existing economics of the industry. We do not read *Colteryahn* as restricting the use of allocations for every purpose in milk regulation for all time to come.

The milk industry has changed drastically from the time of *Colteryahn* in 1938. In those days the industry was fragmented and parochial; today it is big busi-

ness with large cooperatives, refrigerated tank cars hauling milk across many state lines, and merchandising on a grand scale. Dairy dealers now even sell hand lotions, as this record discloses.

The law does not remain static. It is a living thing, and when conditions change, the legislative intent must be read in the light of changed circumstances. Today the producer, dairy dealer, and seller are entitled to recover their costs together with a fair profit; the consumer is entitled to the lowest reasonable price, and all of this is implicit in the legislative intent to protect the public health and welfare.

With these general principles in mind, we now look at what transpired in this case to determine whether or not the Board carried out its duties and responsibilities as mandated by the statute.

## CONSIDERATION OF ALL CONDITIONS

The Board and the dairy dealers rely heavily upon the case of *Colteryahn Dairy v. Milk Control Commission, supra,* for the purpose of excluding evidence, but Chief Justice KEPHART stated at page 27 (332 Pa. 15, 27) : "Any price must consider *all the factors* which, of necessity, enter into the conduct of the milk industry. The problem before the Commission in price-fixing is to provide a fair return to producer and dealer and to maintain a *just consumers' price.*" (Emphasis added)

The record in this case discloses that the City was not permitted to enter into the record any evidence concerning any milk prices or practices in areas outside Milk Area No. 7, although the Board itself and the dairy dealers were freely permitted to introduce evidence concerning the prices for producers and dairy dealers in other states and earnings from all over the United States. Regardless of whether the excluded evidence would have had any effect on the outcome of the

312

case, the mere fact of its exclusion in these circumstances was arbitrary and capricious. The Act clearly says that the Commission should consider all factors affecting the milk industry. Certainly if the price and cost factors in the State of Ohio are permitted by the Board as a general explanation for a wholesale discount to stores receiving more than 400 quarts per delivery, and as justification for an increase of that discount, then by the same logic the consumer prices in that same area are relevant from an evidentiary standpoint and should have been received and thereafter evaluated by the Board.

Although we agree with the Board that it is not necessary (even though it might have been helpful) for the Board to consult with its Bureau of Consumer Affairs in making its determinations in this case, it was error to prohibit the City from attempting to establish evidence on whether or not the Board's staff did consult with the Bureau of Consumer Affairs in arriving at the staff's recommendations on the consumer prices which were set in General Order No. A-762.

UNIFORM SYSTEM OF ACCOUNTS

Before moving to the other statistical problems, we should at this point turn to the argument of the City that the Board has not to the date of this writing put into effect* the uniform system of accounts as mandated by Section 704 of the Act (31 P.S. 700j-704).**

---

* The new Financial Reporting Manual will become effective 90 days after December 31, 1970.

** Section 704. "The board shall, after reasonable notice and hearing, establish systems of accounts (including cost finding procedures) to be kept by licensees and shall prescribe the manner and form in which accounts are to be kept. Every licensee shall establish such systems of accounting and shall keep accounts in the manner and form required by the board in order to facilitate the costs studies provided for in section 801."

The Board and the milk industry knew that on July 31, 1968, the law became effective requiring the Board to establish a uniform system of accounts to be kept by all licensees *"in order to facilitate the cost studies provided for in Section 801."* (Emphasis added)

There can be no question what the legislative intent was in passing this measure. The long history of complaints on the *administration* of the milk pricing laws in this state has involved the deficiency of accounting in the milk industry, whereby one could not make a proper assessment or audit of the statistics offered. There can be no proper audit where all of the dairy dealers are left to their own discretion on accounting for revenues and expenses, especially when there is a problem of dividing those revenues and expenses between jurisdictional and nonjurisdictional items.

Most of the problems, discussed later, on statistical support for the Board's findings would be cured by a uniform system of accounts.

Counsel for the Board boldy stated to this Court that even after carrying out the Board's long-delayed compliance, the end result, which is shown in a booklet offered to the Court, entitled "Financial Reporting Instructions Manual for Milk Dealers to Become Effective in 1971",\*\*\* does not do much more than did the uniform reporting system used prior to the time the Legislature passed this very important act.

There is a difference between a uniform reporting system and a uniform system of accounts.

In a uniform reporting system the regulated companies or persons must transform their accounting records into a form of reporting as required by the regulatory agency.

In a uniform system of accounts all of the regulated companies or persons must keep their accounting rec-

---

\*\*\* Now a matter of public record with the Board.

ords in accordance with a prescribed method set forth by the regulatory agency. In other words, any item, whether it be plant, revenue, or expense, is given a special accounting number. For example, when an expense is incurred, those dollars of expense are entered at that accounting number, which then is backed up by the actual bills or statements which are also kept under that same accounting number. If a dairy dealer in the northern part of Area No. 7 would purchase office supplies, that item of expense would be entered at an account number designated for office supplies, or whatever the uniform system of accounts dictated. If a dairy dealer in the southern part of Area No. 7 also purchased office supplies, it likewise would have the same accounting number, so that all items of revenue and expense for every dairy dealer in the state would be kept in their records on the same basis.*

This, by the way, does not preclude a dairy dealer from keeping its own separate set of records if it desires to do so for tax or stockholder's purposes, but under the uniform system of accounts approach to regulation, it must keep at least one set of records as prescribed by the regulatory agency. A review of the booklet which the Board offered to the Court as showing its compliance with Section 704 does not appear to meet these requirements, and so the Board as of this writing may still not have complied with the mandate of the Legislature. We do not specifically rule on this point inasmuch as the book was not specifically put at issue in this case.

The record is clear that the Board did not utilize the mandated uniform system of accounts for any purpose in this case.

---

* This is not something new or novel. Utilities have for years used such a system with great benefit to themselves as well as to all others concerned.

On February 8, 1971, this Court in the case of *G.S.F. v. Milk Marketing Board*, 1 Pa. Commonwealth Ct., 216 (1971) filed an opinion in a case solely restricted to the question of the Board failing to carry out the mandate of the Legislature on a Uniform System of Accounts. In that case, we remanded the matter back to the Board for further hearing to test the reliability of the Board's findings. On this point we consistently remand this case back to the Board for the same purposes.

### THE BOARD'S USE OF STATISTICS

In its Finding of Fact No. 17, the Board found that the "net sales"* were $107,196,450. That figure was taken from Exhibit No. 3, Table No. 6, which by the title of the table and the testimony of the Board's Executive-Secretary is the *actual* "net sales" figure "reported" by the thirty dairy dealers to the Board (with the minor adjustment for nondairy sales mentioned in the footnote).

This record indicates that during the test year of 1969, there was a milk price increase effective October 15, 1969, so that for the test year only two and one-half months of the increased price is reflected in the "net sales" figure. The problem becomes, obviously, why wasn't the actual "net sales" figure for the test year adjusted upwardly to give effect to the October 15, 1969, increase for the other nine and one-half months of the 1969 test period? According to the record, the

---

* Nowhere in the record is there a definition or description of "net sales". What the amount of gross sales might be is left to the imagination. What is included in "net sales" is anyone's guess. The only adjustment made to "net sales" was in the amount of $152,484 for nondairy sales. In Finding No. 13, the Board says that "total sales" are "net sales", but this must be an error left unexplained.

October 1969 increase was comparable to the increase here imposed by General Order No. A-762, and if that is the case, then the "net sales" should have been increased $\frac{9.5}{12}$ x $7,800,000, or approximately $6,000,000. If that be the fact, then the increase found to be proper cannot be justified. If there was an adjustment to "net sales" for the October 1969 increase in revenues, it is not shown in the record. It is interesting to note that although the Board failed to increase revenues for the test period, it did increase the labor expense for the whole test period of 1969 in Finding No. 14. This matter must be remanded to the Board for clarification. This apparent error is a clear abuse of discretion.

Other examples of the gross inadequacies in the statistics used by the Board are the repeated admissions in the record of the inability of the Board's witness to give the percentage of net sales, labor, revenue, and cost of products applicable to jurisdictional business. And then, there is a final admission on the part of the Board's witness that the staff did not allocate between jurisdictional and nonjurisdictional statistics at all. Under these facts the Board was not able to make any findings on jurisdictional prices.

Over 7% (or $6,000,000) of the "net sales" of the thirty dairy dealers were made out-of-state. Neither the staff nor the Board made any determination in this record on whether those sales were at higher or lower than Pennsylvania prices or whether they in any way affected the earnings and returns of the thirty dairy dealers used. Yet without this information the Board fixed increased regulated prices to adjust the revenues in an attempt to grant the dairy dealers a proper return.

All of these items must be substantiated by the Board on remand.

The Board states that it relied heavily upon the exhibit prepared by its staff* entitled "Compilation of Statistical Data for the Southwestern Milk Marketing Area No. 7" dated August 1970, and although that exhibit is filled with statistical information concerning producer prices of milk, cost indices, wage indices, from Pennsylvania and all over the United States, the exhibit does not explain how the Commission arrived at its findings. It is not self-explanatory. A reviewing court cannot guess at the methods used by the Board to separate and allocate revenues and expenses in arriving at the dairy dealers' return which in turn controls the price level of milk. The record must disclose how these accounting procedures were performed. This is totally absent in this case. If the method of allocation was the utilization of percentages of the revenues received from jurisdictional and nonjurisdictional sales, then the use of this method should, somewhere in the record, be explained and justified. If some other method was used, then it should be disclosed. Otherwise the reviewing court cannot determine whether or not the regulatory agency has exercised its discretion in a reasonable or unreasonable manner.

## THE THIRTY DAIRY DEALERS USED

Although the Board chose thirty dairy dealers in Area No. 7, and the dairy dealers chose eight dairy dealers in Area No. 7, as the number of dairy dealers which would be a cross section of the "normally efficient" ones of all of the eighty-some dairy dealers in Area No. 7, there is nothing in this record other than meaningless generalities to describe why these thirty or eight were chosen. The statute (Section 801) specifi-

---

* Apparently the Board did not use the dairy dealers' statistical exhibit inasmuch as it is not mentioned in the adjudication.

cally mandates that the dairy dealers chosen must be "representative of the average or normally efficient producers and dealers". The record is bare on why or how the chosen thirty are efficient or average. There is no explanation of the type of operation of the remaining dairy dealers who were not considered, and therefore there is no substantiation for the Board using the thirty chosen.

Because of the peculiar nature of regulating the prices to be charged by so many dairy dealers over such a large area of the State, it is understandable that it would not be possible to determine a cost of service for each and every dairy dealer. Therefore it is reasonable to utilize the statistics of some of the dairy dealers chosen as a "cross section" of the "normally efficient" ones. Statistical difficulty does not preclude the Board from approaching an evaluation of such a conglomeration of figures in a way which will explain fully how and why it made its determination.

If this creates very difficult accounting problems, those problems must be approached in a very technical, expert, and professional manner. Certainly the utilities of this State have as many difficult accounting problems as dairy dealers, but they have solved their allocation and separation accounting problems in a reasonable fashion with the help of a uniform system of accounts. Some natural gas utilities sell gas in more than one state and to interstate customers, as well as selling household gas appliances. Some electric utilities even operate whole nonelectric businesses, both regulated and not regulated. If utilities can properly describe, explain, and support the methods used in allocating revenues and expenses, there is no reason why the dairy dealers and this Board cannot do likewise.

We are long past the time when books and records were kept by handwritten methods. Accounting and

comptometer machinery together with data-processing equipment make accounting an almost exact science. It is not difficult in these times to present accurate figures showing a true picture, if one has the desire. The Board is still in the hand dipper stage of milk regulation while the industry has passed into the machine and plastic bottle era of the jet age.

This problem must be remanded to the Board with the direction that it establish, in a reasonable way, why the dairy dealers chosen are representative as the "normally efficient" ones. Under the present status of the record there is no way for a reviewing court to determine whether or not the Board in exercising its discretion has been arbitrary in its choice of representative dealers.

We note in passing that the statute also requires the Board to base producers' prices on the operating statistics of a cross section of normally efficient producers of milk, and that producers' prices should be determined on the cost of production plus a reasonable profit. In this case the Board made no findings on these statutory mandates and therefore on remand the Board will be required to determine whether the rising costs it finds in the cost of producing milk used as the basis for producer prices meet the statutory criteria. Furthermore, if the Federal Milk Marketing Orders mentioned in the Board's adjudication in any way influence or determine the producers' prices set by the Board, this should be explained by the Board.

### ALLOCATION

The record discloses no explanation of how the staff or the Board separated or allocated revenues and expenses between jurisdictional and nonjurisdictional items. The economic reasons given by Chief Justice KEPHART in *Colteryahn, supra,* have substantially

changed during the past thirty-two years, and we must look differently at the bases for allocation. The obvious reason why this now becomes important is that it would be improper to permit a dairy dealer to voluntarily enter into a nonregulated business (which might be totally unrelated to the milk business) at a loss and expect the consumer of regulated products to pay for that loss. If a dairy dealer desires to go into a losing proposition, that is his business, but he should not be permitted to make the consumers of his regulated products pay for that loss, unless there is some reasonable justification for it in the record. For example, it would be grossly improper to permit a dairy dealer to continue a scheme of kickbacks to a supermarket to sell ice cream to the store at a huge loss in consideration of its large purchases of regulated milk, thereby giving an illegal preference.

The record in this case fails to disclose whether or not the nonregulated business of these dairy dealers, whose statistics were utilized by the Board, are involved in any losing nonregulated businesses. All we know with certainty is that the dairy dealers do engage in nonjurisdictional businesses. This is not to say that there could not be justification for a regulated sale to support a nonregulated sale under all conditions. What we do say is that until the record discloses the facts, the dairy dealer petitioners have not proven their case, and the Board cannot make conclusions upon which increased prices can be approved. It should be noted here that the Board did allocate the increased labor expenses "to controlled products" in Finding No. 14.

## FAIR RETURN

The statute states (Section 801) that the Board should determine "a reasonable return to the milk deal-

er or handler". In arriving at that determination, the Board in this case used three different statistics on net profit: (a) net profit before taxes, (b) net profit after taxes, and (c) net profit as a percentage of the sales dollar. Thereafter the Board derived three returns: (a) return on employed capital, (b) return on net worth, and (c) net return on sales dollar. After adding the $7,838,894 increase in revenues to these thirty dairy dealers, brought about by the milk price increases allowed by the Board, to the 1969 revenues entitled "net sales", the Board finds that the "net return on the sales dollar" is 2.4 per cent. The "net return on net worth" is 16.32 per cent, and the "net return on employed capital" is 12.18 per cent. Nowhere in the record are the terms "net worth" or "employed capital" explained.

We then refer to Table 14 of the Board's own exhibit, entitled "Financial Earnings of Leading Dairy Products Corporations, by Years, 1954-1969", which would indicate that on a national basis the return on "net assets" between 1954 and 1969 has never been more than 12.6 per cent, and for the year 1969 was 11 per cent. On Table 15 entitled, "Net Income of Leading Corporations for the Years 1968 and 1969", the return on *"net worth"* for "dairy products" businesses in the nation was 11 per cent for the year 1969.

The question immediately arises as to where in the record is there any justification for a return on *"net worth"* 50 per cent higher than has ever been earned in the industry over the past 15 years. Either this is an unreasonably high return on *"net worth"* or there is a misuse of or double meaning to the Board's use of "net worth" in its own exhibit. If we add the possible adjustment mentioned hereinbefore for the October 15, 1969 price increase for the applicable nine and one-half months (about $6,000,000 gross), then the return

on any basis is more than can be justified, before any new price increase.

In any event, the matter must be remanded to the Board for some justification or explanation.

### General Order A-757

The record discloses that between the October 15, 1969, general milk increase and the filing for this new milk increase in this case, the Board issued another General Order No. A-757 on June 20, 1970. This order in effect increased the wholesale milk discount for those stores receiving 400 quarts or more per delivery. There is nothing in this record to indicate what effect that order will have on the cost of service statistics utilized in determining milk prices in this case. In other words, General Order No. A-757 changed the regulated price of milk, and unless there is something in the record to show that it did not affect the cost of regulated milk products or the earnings of the dairy dealers, then it should show by how much it did or will increase or decrease the cost of milk to consumers.

We agree with the Board that it would be improper to retry the issues involving the principle of permitting an increased wholesale discount to stores receiving more than 400 quarts per delivery; however, if that sales classification affects the prices under consideration, then it does become relevant. The record discloses that the reason for this special discount was to eliminate the practice of large supermarkets buying their milk supply in Ohio at a cheaper price and transporting it to Pennsylvania. Inasmuch as there is no adequate explanation or support for this item and what effect it has on the prices for regulated milk, this matter will have to be justified and explained on remand.

EVIDENCE REFUSED

In connection with the Board's refusal to permit the City to introduce consumer prices and evidence from areas outside Milk Marketing Area No. 7, it should be remembered that in the case of *Colteryahn Dairy v. Milk Control Commission*, 332 Pa. at p. 31, Chief Justice KEPHART said: "Prices in other areas should not be taken as a guide *unless* it appears from the record that there is a fair comparison under similar situations and conditions." (Emphasis added) As stated before, although the Board utilizes the *Colteryahn* case to eliminate such evidence, the statement of Chief Justice KEPHART is clear that such evidence should be permitted, and that only after all factors affecting the pricing of milk are permitted on the record can such a "comparison" be made. It was error to prohibit this kind of information to be presented to the Board. It might very well be that such information would not be used by the Board, but until it is offered and placed in the record, that determination cannot be made.

SUMMARY

We have concluded that the Board did not carry out its statutory duty to consider all of the evidence available in keeping with the legislative intent to protect all the parties involved in a milk price hearing, i.e., producers, dairy dealers, handlers, and consumers.

The case must be remanded to the Board for further hearing and consideration in conformity with this opinion. Without intending to limit such rehearing, but for the purpose of aiding the Board, the rehearing should include:

a. A cost of service study related to a test period with all statistics being either actual or adjusted with satisfactory explanation for such adjustments. (1) revenues and expenses should be adjusted (again with ex-

planation) for all known conditions so that all concerned will know what the earnings are for one full test period.

b. In choosing a cross section of normally efficient dealers in Milk Marketing Area No. 7, there must be an explanation for such choice.

c. The record should show a breakdown of the total cost of service statistics into jurisdictional and nonjurisdictional items (e.g., plant equipment, facilities, services, revenues, expenses, etc.). (1) All allocations must be explained and supported in the record.

d. The Uniform System of Accounts presents a peculiar problem. We have determined in this case (as well as in *G. S. F. v. Milk Marketing Board, supra*) that the matter should be remanded for compliance with the legislative mandate. However, in the *G.S.F.* case the ordered increased milk prices were permitted to stand. Here we cannot permit that to happen because the record indicates that the dairy dealers' present earnings may be adequate, based upon a possible adjustment to "net sales" as explained above. Therefore on remand we direct the Board to hold a separate hearing, as soon as possible under its rules, restricted solely to the question of whether the Board's use of $107,196,450, as "net sales" does or does not reflect an adjustment for the test period figures used (the year 1969) for a whole year under the prior milk price increase of October 15, 1969. We expect the Board to complete the hearing restricted to this matter of "net sales" figures with an adjudication on or before May 1, 1971. If it is determined that the "net sales" figures do include all proper adjustments so that it represents the realistic revenues received for the test period, then the prices set in General Order No. 762 will be permitted to remain effective during the rehearing period. If such a hearing indicates that no adjustment has been

made, giving effect to the October 15, 1969 increase, then the prices set in General Order No. A-762 will be revoked automatically by an order of the Board, or on May 1, 1971, whichever occurs first.

It is our intent here to assure the dairy dealers that they will not earn less than permitted under the statute during the rehearing. Therefore we direct first a rehearing on "net sales" and thereafter a rehearing on the remaining matters.

 e. The record shall disclose an explanation of the terms "net sales", "cost of sales", "net worth", and "employed capital".

 f. The Board must make findings on all items required by the statute, e.g.: (1) that the prices set for producers is not below the cost of production plus a reasonable profit.

 g. The record must support a finding that the wholesale discount rate is justified under the statute, and what effect, if any, it has on the test period statistics.

 h. The Board shall receive all evidence and testimony relevant to the issues involved in milk pricing hearings and shall have the prices set "upon all conditions affecting the milk industry" as provided in the statute.

 i. On all matters pertaining to the Uniform System of Accounts the Board will embark immediately to comply with the legislative mandate, and except for the special hearing described in paragraph (d) of this summary, all other rehearings shall be in accord with Section 704 of the Act (31 P.S. 700j-704).

At the rehearing hereon, the petitioners shall be required to go forward to support their petition, and the intervenors and staff of the Board shall thereafter proceed to offer such evidence and testimony as may be proper.

Accordingly, we enter the following

## ORDER

Now, March 5, 1971, it is hereby ordered that the record in this proceeding be remanded to the Milk Marketing Board for further hearings consistent with this opinion; with the prices as fixed in Official General Order No. A-762 to remain in effect consistent with this opinion.