Brookwood Farms, et al. *v.* Milk Marketing Board and Farmers Union Milk Products Association, Intervening Appellees (Four Appeals).

512

Argued April 2, 1973, before President Judge BOW-MAN and Judges CRUMLISH, JR., KRAMER, WILKINSON. JR., MENCER, ROGERS and BLATT.

*Willis F. Daniels,* with him *Harold W. Swope* and *Daniels & Swope,* for appellants, Brookwood Farms, et al., 322 C.D. 1973.

*Roland Morris,* with him *David C. Toomey* and *Duane, Morris & Hechscher,* for appellants, Milk Dealers Association of the Philadelphia Area, Inc., et al., 324 C.D. 1973.

*Donn L. Snyder,* with him *Berman & Boswell,* for appellants, Gorman's Dairy, Inc., et al., 359 C.D. 1973.

*Eugene B. Strassburger, III,* Executive Assistant City Solicitor, with him *Ralph Lynch, Jr.,* City Solicitor, for appellants, City of Pittsburgh, et al., 394 C.D. 1973.

*Walter J. Sullivan,* Chief Counsel, for appellee.

*Francis A. Kelly,* with him *Michael A. Marks,* for intervening appellee.

OPINION BY JUDGE KRAMER, April 19, 1973:

These appeals are from eight Official General Orders Nos. A-733 through A-780 (hereinafter collectively referred to as General Order No. A-733, unless otherwise specifically noted), issued by the Pennsylvania Milk Marketing Board (Board), posted on March 6, 1973, to become effective March 13, 1973, in which the minimum prices to be paid by dairy dealers to the producers of Class 1 milk, at 3.5 percent butterfat content, was increased 92 cents per cwt. in all of the eight milk marketing areas in the Commonwealth. It has been represented that these orders will increase the cost of such milk to Pennsylvania dairy dealers by $25,000,000 per year, or $15,000,000 after giving effect to federal milk pricing orders. The basis for General Order No. A-773 is an undated adjudication entitled "Findings of Fact and Conclusion in Support of Official General Orders Nos. A-733 through A-780" signed by two members of the three-member Board. By Order of this

Court dated March 26, 1973, all of the appeals herein were consolidated for purposes of argument and decision, and the matter was set down specially for argument on April 2, 1973, because of the alleged urgency of the circumstances.

This matter had its beginning when the Board issued a call for a hearing through its Bulletin No. 927, dated January 26, 1973, wherein the Board published notice of a limited hearing to be held on February 6, 1973, concerning minimum producers' milk prices throughout the entire Commonwealth. Because this call or notice runs to the very heart of these appeals, we set forth the pertinent provisions of the notice, which read as follows:

"In accordance with the provisions of the Milk Marketing Law of April 28, 1937, P. L. 417, as amended, the Milk Marketing Board of the Commonwealth of Pennsylvania, will conduct a public hearing to be held in room No. 309, Agriculture Building, 2301 North Cameron Street, Harrisburg, Pennsylvania, beginning at 10:00 o'clock a.m., on Tuesday, February 6, 1973, for all of the milk marketing areas in the State as follows:

. . .

"This hearing has been called by the Milk Marketing Board upon petition of the following dairy farmer cooperatives:

. . .

"The only testimony to be taken will be that concerning minimum prices farmers shall receive for their milk in each of the eight milk marketing areas of the state.

"The schedule to be followed and the presentation of testimony is given below:

"(1) Testimony by individual dairy farmers and/ or dairy farmers cooperatives and farmer associations.

"(2) Testimony by Commonwealth witnesses."

This notice was signed by two members of the three-member Board, and as was explained on the first day of hearing, on the record, the third member of the Board registered his objection and opposition to the hearing based upon his observation and belief that the call improperly restricted the hearing, by prohibiting the dealers to present evidence. The record quite clearly shows that prior to the date of the first hearing, some dairy dealers, and certain of their associations, in seven of the milk marketing areas requested the Board to amend its call so as to permit the dairy dealers to present testimony and evidence. This request was denied by the Board and confirmed by letter addressed to counsel for the dairy dealers, on the basis that it was the intention of the Board to meet what it called an "extraordinary emergency situation" involving rising costs "in feed costs . . . borne by producers." It is interesting and important to note that at the opening of the hearing the dairy dealers, once again, on the record, made a motion that the Board open the hearings for the purpose of receiving testimony and evidence from the dealers on "all matters concerning the milk industry." This motion was joined in, or supported by all of the dairy farmer producers present at the hearing, except for the possible exception of one, whose statement for the record in connection with that motion is ambivalent. Counsel for this one group of producers was more concerned about the legality of permitting the dealers to present testimony and evidence in the face of the call which prohibited such testimony and evidence, than he was concerned about limiting the call in the first instance. Even counsel for the Board was concerned over the procedure followed by the Board, for at page 39 of the transcript he queried the Board: "Is it not correct that testimony from any party, whether consumer or dealer or whoever, will be received at this hearing if programmed to the subject of

producer prices?" In response, the Chairman of the Board referred to the call (quoted above) and stated: "Therefore, I must rule that your statement is wrong, Mr. Sullivan, in that we will take only testimony from dairy farmers, dairy farmer cooperatives and farmer associations and Commonwealth witnesses." The Chairman reiterated his ruling several times during the course of the two-day hearing.

Later in the hearing, an attorney for the City of Pittsburgh (City) attempted to present a statement on behalf of consumers. Although the record is replete with statements made by producers (who as non-lawyers were permitted to participate in the hearing, either for themselves or for organizations or associations), the Chairman of the Board refused to permit counsel for the City to make any statement whatsoever. At page 348 of the transcript of testimony, the Chairman of the Board stated: "I want to say we are not entertaining any statement from counsel, Mr. Pauline, from the City of Pittsburgh. He entered his appearance, he can speak as an attorney for or against the motion, but there is no statement that I am going to permit on the record on behalf of consumers." The full flavor of the dictatorial power of the Chairman of the Board is highlighted in the record where he was challenged by counsel for some of the dealers to consult with the other members of the Board before making such basic rulings, that the dealers and the consumers should not be permitted to participate at the hearings. The Chairman of the Board flatly ruled that he was making the rulings on behalf of the Board. At two other places in the record, witnesses on behalf of the producers presented testimony through prepared statements which, apparently through inadvertence, included comments to the effect that the Board should consider passing any increased prices to producers through to the dairy dealers. When counsel for the dairy dealers attempted to

cross-examine on the basis of this direct testimony, the Chairman of the Board ruled that the comments of the witnesses would remain as a part of the record, but counsel was denied any right to question in any manner whatsoever these statements made on direct examination.

The record is also replete with statements by dairy farmer producers who expressed their concern over the manner in which the Board was conducting the hearings, and had issued the limited call. The dairy farmer producers believed they were entitled to a price increase for the milk they sell to the dairy dealers as a matter of an emergency; and they were concerned that, if the proceedings were improperly or illegally conducted, their efforts to obtain increases in prices would be thwarted in the courts of this Commonwealth. Their fears were justified, for the thrust of the appeals by the dairy dealers and the consumers in these cases is that the Board improperly limited the call of the hearings, improperly conducted the hearings, and improperly refused to permit the dairy dealers and the consumers to present testimony and evidence.

The Milk Marketing Law (Act of April 28, 1937, P. L. 417, as amended by the Act of July 31, 1968, P. L. 963, 31 P.S. §700j-101 et seq.) at Section 906 (31 P.S. §700j-906) sets down the guidelines for the scope of inquiry by this Court, wherein it states: "Upon any appeal the court shall determine whether or not the order appealed from is reasonable and in conformity with law. The appellant shall have the burden of proving that an order of the board is unreasonable or illegal. If the court shall determine that the order is unreasonable or illegal, it shall remit the case to the board with directions to reform the findings or order, or to revoke the order, in accordance with the court's opinion." The Pennsylvania Supreme Court in the case of *Milk Control Commission of Pennsylvania v. United*

*Retail Grocers Association,* 361 Pa. 221, 226, 64 A. 2d 818, 820 (1949), in referring to identical language in the original Act (Act of April 28, 1937, P. L. 417), sheds further light on the scope of review, when it said: "The sufficiency of evidence presented before the Commission [Board] for the purpose of inducing a decision that fair return to producers or dealers, as the case may be, requires a revision of established minimum prices or markups, is a matter for the exercise of judgment by the Commission, in the first instance, and its conclusion may not be disturbed unless it has capriciously refused to consider items that should have been entertained, or has entertained items that should not have been entertained, or has not given that weight to the evidence which due process requires. . . ." This Court said in the case of *City of Pittsburgh v. Milk Marketing Board of the Commonwealth of Pennsylvania,* 1 Pa. Commonwealth Ct. 300, 305, 275 A. 2d 115, 118 (1971) : "We recognize that the statute has vested authority in the Board to determine technical matters, and that in carrying out this determination it is necessary for the Board to exercise discretion in making its adjudication. It may happen that the exercise of that discretion will be difficult and not to the liking of many persons. However, even though the reviewing court might have chosen a different application, it should overturn the adjudication of the Board only for a clear abuse of discretion or an error of law. It is the duty of this Court to determine whether the Board in fixing milk prices in this case has considered those factors which are essential to sustain the validity of the Board's order."

This Court has also ruled that due process of law under the Federal and Commonwealth Constitutions is a necessary requirement of all hearings before administrative agencies of this Commonwealth. *See Pennsylvania Crime Commission v. Nacrelli,* 5 Pa. Common-

wealth Ct. 551 (1972); *Gaudenzia, Inc. v. Zoning Board of Adjustment*, 4 Pa. Commonwealth Ct. 355, 287 A. 2d 698 (1972); *Donnon v. Downingtown Civil Service Commission*, 3 Pa. Commonwealth Ct. 366, 283 A. 2d 92 (1971).

With these guidelines in mind, we believe that the record in this case discloses a severe abuse of discretion. In Section 801 of the Milk Marketing Law, 31 P.S. §700j-801, the Legislature has set forth the "Requisites of orders fixing price of milk," which the Board must adhere to. This section reads as follows in pertinent part:

"The board shall ascertain, after a hearing in which *all interested persons* shall be given reasonable opportunity to be heard, the logical and reasonable milk marketing areas within the Commonwealth, shall describe the territorial extent thereof, shall designate such areas by name or number, and shall ascertain and maintain such prices for milk in the respective milk marketing areas as will be most beneficial to the public interest, best protect the milk industry of the Commonwealth and insure a sufficient quantity of pure and wholesome milk to inhabitants of the Commonwealth, having special regard to the health and welfare of children residing therein.

"The board shall base *all prices* upon *all conditions* affecting the milk industry in *each* milk marketing area, including the amount necessary to yield a reasonable return to the *producer, which return shall not be less than the cost of production and a reasonable profit to the producer,* of the quantity of milk necessary to supply the consumer demand for fluid milk plus a reasonable reserve supply as determined by the board, *and a reasonable return to the milk dealer or handler.* However, where the board determines that the market for Pennsylvania produced milk is *threatened* it may establish *producer prices* designed to market the milk.

In ascertaining such returns, the board shall utilize a *cross-section* representative of the average or normally efficient *producers and dealers* or handlers in the area and shall consider the cost of containers according to size and type.

. . . .

"The board may, upon its own motion or upon application in writing, from time to time, alter, revise or amend an official order . . . fixing prices to be charged or paid for milk. Before making, revising or amending any order . . . fixing prices to be charged or paid for milk, the board shall hold a hearing, after giving reasonable opportunity to be heard to interested persons, of whom the board has notice. . . .

" 'Interested persons' as used in this section, means all persons who may be affected by an order of the board fixing prices. . . .

. . . .

". . . Any determination by the board, or a court to which an appeal has been taken, that the wholesale or retail prices provided are invalid shall not prevent the enforcement of prices to producers, but any determination that the prices to producers are unreasonable shall require the redetermination by the board of wholesale and retail prices as well as prices to producers." (Emphasis added.)

Whether or not this Court agrees with such an approach to the fixing of prices for milk is of no moment. We stated in *City of Pittsburgh v. Milk Marketing Board of the Commonwealth of Pennsylvania, supra*: "It is not within the purview of this Court to make the decision on whether or not there should be *any* regulation of the dairy industry. Only the Legislature can do that, and it has consistently been the sense of that deliberative body to continue the regulation. Once that decision is made for us there must be compliance within the full meaning of the legislative intent. Half-

way measures are not compliance." (Emphasis in original.) 1 Pa. Commonwealth Ct. at 308, 275 A. 2d at 120. In that same case, this Court clearly established our interpretation of the legislative intent of Section 801, where we stated that "(1) the producers of milk, (2) transporters, processors, and sellers of dairy products, and (3) the consuming public" were all entitled to equal consideration insofar as is reasonably possible in setting and fixing the prices of milk throughout this Commonwealth. The Board's denial of the dealers and consumers to present any testimony or evidence, as this record clearly establishes (the statement of the Board to the contrary notwithstanding), is in direct violation of the Milk Marketing Law, and was a denial of due process of law.

The Board attempts to defend its position in this case with the repeated statement that there was in existence at the time of this hearing "an extraordinary unprecedented emergency situation urgently and adversely affecting dairy farmers" arising out of increased feed and other costs. This Court is well aware of the rising costs under the existing spiraling inflation, and recognizes that the record made in this case reasonably implies the fact that the producers of milk in this Commonwealth have experienced increased costs of operation. This Court is very sympathetic to the plight of the dairy farmer producers. However, we are bound by the law.

We disagree with the dairy dealers' position that the Milk Marketing Law does not provide authority for the Board to act in an emergency. We find in Section 301 of the Milk Marketing Law, 31 P.S. §700j-301, power in the Board to "regulate the entire milk industry of this Commonwealth" and in Section 302, 31 P.S. §700j-302, it is stated: "The operation and effect of any provision of this act conferring a general power upon the board shall not be impaired or qualified by

the granting to the board by this act of a specific power or powers." Thereby, we can find legislative intent within the Milk Marketing Law to provide for the meeting of emergencies. The problem, however, is that the Board did not provide for a due process hearing, the protection of the dealers and consumers, nor did it follow the mandates of the Milk Marketing Law.

To highlight some of these deficiencies, we first point to the fact that there is no mention whatsoever in the call or notice of the hearing that the Board intended such hearing to be on an emergency basis. Neither the dealers nor the public were adequately notified of the nature of the intended hearing. Although the Board at the hearing and in its adjudication referred to petitions and correspondence of producers in connection with the alleged emergency, nowhere in the record did the Board establish or produce any proof of the allegations of emergency. None of the petitions or correspondence was ever produced. Interestingly enough, the Board made two specific findings of fact that there was no such emergency. In Finding No. II(15), it stated: "There is nothing in the record to suggest that the market for Pennsylvania produced milk is threatened, and it is not." In Finding No. II(16), the Board stated: "The record is clear that there is now and will be for the foreseeable future a more than sufficient quantity of pure and wholesome milk available to the inhabitants of the Commonwealth, and that adequate supply is in no way threatened."

As we interpret the Milk Marketing Law, it is conceivable that the Board could call an emergency type hearing with full disclosure of the nature of the emergency and the nature of the hearing. (See 31 P.S. §700j-801, quoted above.) It is also conceivable that the Board could take testimony for the purpose of meeting such emergency or threat so long as all interested parties were properly notified and heard. However, even

in an emergency situation, the statute does not permit the Board to prevent an interested party from presenting testimony or evidence pertinent to the emergency hearing. Given the above, it is likewise possible that as a result of a proper record made, the Board could establish emergency prices so long as all of the interested parties were protected under the provisions of Section 801. In other words, we can find statutory authority for the Board to meet emergencies; but if it does so, its proceedings and adjudications must be carried out and couched in such a way as to meet the legislative intent as set forth in the statute. In *City of Pittsburgh v. Milk Control Commission (No. 1)*, 87 Dauph. 237, 242 (1967), the court said: "The Milk Control Law contains no special provisions for relaxation of requirements to deal with any given milk marketing problem, even though it may be characterized an emergency."

Another dairy dealer's complaint, in these appeals, is that the Board improperly combined all of the milk marketing areas in one hearing. We find no such restriction in the law. However, we are in complete agreement with the dealers that once the Board establishes milk marketing areas, then the legislative intent requires that prices within each area must be separately determined based upon the facts and record established for each milk marketing area. In essence, it was not improper to combine all areas in one hearing; however, the record discloses that the Board did not adequately separate the hearing or statistical data necessary to establish prices for each area.

This Court is well aware of the complicated nature of the statistical approach to the fixing of milk prices, both for producers and dealers. We have read and reread the record in this case, and conclude that at best the evidence produced was too general in nature and inadequate to establish what the producers' prices

should be in each milk marketing area. Every administrative adjudicative agency in this Commonwealth must have sufficient substantive evidence to support its adjudication. "[T]he Commission [Board] may not fix any price, for any product, without first holding a hearing at which sufficient competent evidence is produced from which the Commission can make findings in support of any such price." *Meadow Gold Dairies v. Milk Control Commission*, 61 Dauph. 25, 29 (1950). *See also City of Pittsburgh v. Milk Control Commission*, 86 Dauph. 123, 127 (1966). The record here discloses primarily the increased cost of production on a statewide basis. The statistics were taken from published bulletins, the applicability and accuracy of which were never established. In addition, the one witness (Mummert) who attempted to generally state the increased cost of production for each of the milk marketing areas did not disclose the basis for his statistics. He also included prospective increased costs, which were not proven for each milk marketing area. For some of the areas, he recommended increased prices less than the ultimate increase permitted by the Board. We have carefully reviewed the testimony and exhibits of the seventeen witnesses heard by the Board for all eight of the milk marketing areas; and, by count, in four of the areas, none of the witnesses, with specificity, even recommended (forgetting for the moment proved) an increase as high as that found and ultimately ordered by the Board. The Commonwealth's sole witness (the Board's Executive Secretary) cursorily presented nothing more than a list of the existing state and federal minimum producers prices and (federal) producers receipts. The Commonwealth's presentation was meaningless insofar as the Pennsylvania Milk Marketing Law is concerned. All of this tends to lead to the inevitable conclusion that there probably was insufficient statistical evidence to support the Board's order for

each of the milk marketing areas. In any event, this Court is not required to meet that issue due to the Board's failure to conduct a proper hearing.

Because we are remanding, and there obviously will be future hearings, it may be helpful to all concerned to discuss the role of federal price orders, in setting state producer prices. We have noted with interest the fact that most of the exhibits which were introduced into evidence referred to, or were based entirely on, federal price orders, some as recent as March 1973, for the sale of milk by producers to the dairy dealers. Nowhere in the record, nor in the Board's adjudication, is there an explanation of the effect or purpose of federal pricing orders in this case. Research has led us to the Federal Agricultural Marketing Agreement Act of 1937, as amended, 7 U.S.C. §601, et seq., and the U. S. Department of Agriculture Order No. 36, 37 Fed. Reg. 25236 (1972), effective January 1, 1973. Even a cursory reading of this federal statute and order exposes the fact that in federal marketing areas (which for the most part are multi-state, as they affect the Commonwealth of Pennsylvania) where the United States Secretary of Agriculture has established minimum prices to be paid by the dairy dealers to producers, which are higher than the minimum prices set by the Pennsylvania Milk Marketing Board, the federal government has pre-empted the field. Twelve counties in Western Pennsylvania are included in zones 1, 2 and 4 of the Federal "Eastern Ohio-Western Pennsylvania Marketing Area." When comparing the testimony and arguments presented to this Court with the federal statute, one is startled to learn that the federal minimum prices paid to producers are not set upon the cost of production plus a reasonable profit, but rather are set upon a formula which has as its base the average price received by producers of milk in the Minnesota-Wisconsin area, which reflects all the economic conditions

affecting the supply and demand of milk in those two states. It is likewise interesting to note that under the federal statute, the federal minimum prices paid to producers in each federal milk marketing area, as set by the Secretary of Agriculture, is based upon the Minnesota-Wisconsin formula base price *plus* an amount for additional economic factors of each area. Furthermore, the federal minimum price so established is subject to a ballot vote (determined by a mail referendum) of the producers selling milk in each federal market area, under which at least two-thirds of those voting must vote to approve, before the federal minimum price becomes enforceable.

Under the most recent federal pricing Order No. 36, effective January 1, 1973, the federal minimum price for Class 1 milk containing 3.5 percent butterfat, is $1.85 cwt., plus the basic formula price as established in the Minnesota-Wisconsin area. The point in referring to the federal minimum price order at this place is that this fact discloses that any dealer or seller of milk, for example, in the twelve counties of Western Pennsylvania, must pay to any producer who sells milk to any such dairy dealer that federal minimum price. This in turn means that any producer, whether within Pennsylvania or outside, cannot receive less than the federal minimum price from any dealer selling in the respective federal area. In view of the fact that the federal statute provides for a full hearing wherein testimony and evidence are received from producers, dealers and consumers, all of the economic conditions (including the soaring increased cost of feed, wages, etc., mentioned in this case) affecting the sale of milk by producers has been passed upon by the federal government as it affects such sales in Western Pennsylvania. If the Pennsylvania set minimum prices are less, then by pre-emption, the federal minimum prices prevail. Of course, if the state minimum prices are higher, then

they prevail. Nowhere in the record was it established the number of Pennsylvania dairy farmer producers or the territorial (counties or otherwise) limits of the Commonwealth covered by a federal milk market area. This omission is surprising in light of the extent of the testimony and evidence set forth in the record, and the apparent great reliance by the Board on the federal milk price regulations.

In an attempt to support its actions in this case, the Board argues that the dealers are not harmed by the Board's restricting the milk price increase to producers' prices because the Board sets only minimum prices for both. As the argument goes, if the dealers cannot absorb the increase cost, they can merely raise their prices to the consumers. In its argument, however, the Board conveniently forgets its duty to the consumers, which this Court said it could not do. *See City of Pittsburgh v. Milk Marketing Board of the Commonwealth of Pennsylvania, supra.* In addition, nowhere is it explained why the dairy farmer producer cannot likewise raise his prices over the last minimum prices set by the Board. In the federal regulated areas, the producers' prices may be raised without consultation with the Board.[1] Furthermore, there is nothing in this record to disclose why all of Pennsylvania is not in some federal milk marketing area. If all of the Pennsylvania producers have the option to receive higher prices by becoming included in a federal area, whereby all their increased cost of production may be considered, where is the emergency?

Anyone who has studied the history of the development of the production and sale of milk products in this century knows that there has been a dramatic and con-

---

[1] It is interesting to note that the federal statute provides federal cooperation with state milk regulators and even suggests joint hearings. Whether this has been done or considered is a mystery in this record.

tinuous change. From (1) a historical study of the development of farmer cooperatives in an effort to stabilize milk prices and for economic protection, through collective bargaining with dealers, through (2) the necessity for government regulation caused by the economic depression of the early Thirties, and (3) the most dramatic changes, involving farm bulk tanks, refrigerated long distance transportation vehicles, and bottling, we know that the economics of the milk industry is one of the most complex and perplexing problems facing all of us.

This Court understands, in part at least, some of these problems. It is conceivable that in determining the cost of production plus a reasonable profit to the producer or a cross-section of producers, it is impractical to insist upon the accounting and auditing procedures which the Legislature has required of dairy dealers. This is especially so when we try to compare one farmer with ten cows, who utilizes the services of his wife and children, with another, who maintains a herd of 100 cows, with many employes and modern milking machines. The Board has been established by the Legislature for the very purpose of exercising its expert knowledge and experience in making such difficult determinations. This Court will not reverse or upset orders of the Board fixing prices upon statistical evidence general in nature which supports its orders and which no interested party proves to be erroneous or improper. We reiterate, however, that we need not pass upon whether the evidence presented in this case was supportive of the minimum prices set by the Board in the eight milk marketing areas of this Commonwealth, because the Board improperly and illegally prohibited the dairy dealers and the consumers to present testimony and evidence.

On February 9, 1973, some of the dairy dealers involved in this case approached this Court with a peti-

tion (dated February 7, 1973) seeking an injunction against the Board issuing Orders in these cases without fully hearing all interested parties. The President Judge of this Court, by Order, denied a preliminary injunction for the reason that the dealers had an adequate remedy at law through the process of the appeals, eventually taken herein, but in his Order he warned the Board that it was proceeding in a perilous fashion. That Order, in pertinent part, reads as follows: "It is the view of the hearing judge, however, that if the Board issues orders increasing the minimum producer prices in any one or more milk marketing areas without having received and considered evidence relevant to the impact of any such increases upon all conditions affecting the milk industry in each milk marketing area, including the amount necessary to yield a reasonable return to the producer and a reasonable return to the milk dealer or handler, Section 801, Milk Marketing Law, Act of July 31, 1968, P. L. (Act No. 294), 31 P.S. §700j-801, such an order or orders would very possibly be unlawful and their issuance would serve only to confuse the consumer public and disrupt all segments of the milk industry." The Board apparently ignored the warning and committed reversible error.

In summary, then, we hold that the call or notice of the Board violated the principles of due process of law and the mandates of the Milk Marketing Law. The Board illegally prohibited the dairy dealers and the consumers from presenting testimony and evidence which may have been pertinent to the final adjudication. Therefore, this Court has no other recourse but to remand this matter back to the Board with specific instructions to revoke its General Orders Nos. A-773 through A-780. Incidentally, the Board's motion to dismiss as to area No. 3 is denied for the reason that an

appeal involving area No. 3 was properly filed. Therefore, we

## ORDER

AND NOW TO-WIT this 19th day of April, 1973, based upon the above opinion, it is ordered that the Official General Orders Nos. 773, 774, 775, 776, 777, 778, 779 and 780 are hereby reversed and the matters are hereby remanded back to the Milk Marketing Board with directions to revoke said General Orders and for further hearings consistent with said opinion.

CONCURRING OPINION BY PRESIDENT JUDGE BOWMAN:
I fully concur with the result reached by the majority as expressed in the able opinion of Judge KRAMER. However, I hesitate in fully concurring solely with respect to the majority conclusion, as I understand it, that Sections 301 and 302 of the Act, 31 P.S. §§700j-301-302, disclose an intent on the part of the Legislature to confer upon the Milk Marketing Board emergency power without limitation as to the nature of the emergency or as to what element or elements of the milk industry any such emergency may affect.

Only one section of the statute can be said to specifically deal with the subject of an "emergency." Section 801, 31 P.S. §700j-801, which lays down the requisites for orders fixing prices of milk also contains a proviso that where the Board determines that the market for Pennsylvania-produced milk is threatened, it may establish producer prices designed to market the milk. Whether such a proviso be labeled an emergency power or simply a right in the Board under the designated circumstances to act without meeting the mandates of Section 801 otherwise applicable to its price-fixing power is of no moment here. Its importance, in my opinion, is in disclosing an awareness of the Legislature of special circumstances or an "emer-

gency" incident to which it desired to give the Board special powers and did so with respect to the circumstances described in the proviso in Section 801. The generalities of Sections 301 and 302 should not, in my opinion, control as to this question over the specifics of Section 801. In any event, as the majority points out, the Board in these cases flatly declared that the market for Pennsylvania-produced milk was *not* threatened. It was not, therefore, acting under any special power or authority given to it by the proviso contained in Section 801.