Lily Penn Food Stores, Inc. et al., Petitioners v. Commonwealth of Pennsylvania, Pennsylvania Milk Marketing Board, Respondent.

Argued November 15, 1983, before President Judge CRUMLISH, JR. and Judges ROGERS, WILLIAMS, JR., CRAIG, MacPHAIL, DOYLE and BARRY.

*Sheldon A. Weiss*, with him *Kevin J. McKeon, Rose, Schmidt, Dixon & Halsey*, for petitioners.

*Daniel T. Flaherty, Jr.*, Chief Counsel, for respondent.

OPINION BY JUDGE CRAIG, February 13, 1984:

Lily Penn Food Stores, Inc., Donna Thomas, and Joan Arnone, individually and on behalf of all Area 1 milk consumers (collectively referred to as "Lily Penn" in this opinion), appeal from Pennsylvania Milk Marketing Board (board) General Order No. A-

847, which, for Zone 1 (one of the two zones in Area 1), continues in effect minimum resale prices for 2% lowfat, 1% lowfat, and skim milk respectively at eight cents, twelve cents, and 24 cents per gallon less than the minimum resale price for whole milk.

We have been asked to decide if the board abused its discretion by refusing to lower minimum resale prices for lowfat and skim milk for all of Area 1. Because we conclude that it has, and has erred as a matter of law, we vacate the board's order and hold that existing minimum prices for lowfat and skim milk in all of Area 1 are invalid and therefore unenforceable.

## HISTORICAL BACKGROUND
### *Previous Litigation*

Two decisions by this court which predate Order A-847 and certain actions by the board, after the filing of that order on May 13, 1982, bear directly upon the scope of our order here. In 1979, our court approved the division of Area 1—the Southeastern Milk Marketing Area—into two marketing zones. *Lily-Penn Food Stores, Inc. v. Pennsylvania Milk Marketing Board*, 42 Pa. Commonwealth Ct. 92, 400 A.2d 661 (1979) *(Lily Penn I)*. Zone 1 consisted of Philadelphia and Delaware counties and those portions of Bucks and Montgomery counties south of the Pennsylvania Turnpike; Zone 2 consisted of Chester County and those areas of Buck and Montgomery counties north of the Pennsylvania Turnpike.

In 1980, at the request of the Suburban Milk Dealers Association, the board convened hearings to review minimum prices in Zone 2 and then issued General Order No. A-837, increasing minimum resale prices for whole, lowfat, and skim milk by twelve cents per gallon. On appeal, we reversed, holding that the board had failed to use a representative cross-section of dealers in ascertaining a reasonable rate of return,

and had abused its discretion in rejecting the only material evidence on the issue of low fat and skim milk price margins. *Lily Penn Food Stores, Inc. v. Pennsylvania Milk Marketing Board*, 62 Pa. Commonwealth Ct. 597, 437 A.2d 485 (1981) *(Lily Penn II)* (allocatur denied). Accordingly, by order of November 25, 1981, we remanded the matter to the board for a redetermination of minimum prices for Zone 2, with instructions to (1) consider relevant unit cost evidence and (2) support future findings and conclusions with a discussion sufficient to permit meaningful appellate review.[1]

To date, the board has not scheduled redetermination hearings for Zone 2. Rather, after our decision in *Lily Penn II*, the board promulgated regulations to amend its uniform system of accounts[2] and devised a set of instructions for Commonwealth milk dealers which will require them to submit certain unit cost information with their annual financial statements. Significantly, after issuing A-847—the order here on appeal—the board also issued General Order No. A-848, recombining Zones 1 and 2 into a single marketing area.[3] Thus, Zones 1 and 2 no longer exist as board-recognized independent geographic entities; only Area 1 remains.

*General Order A-847—The Present Board Decision*

In October of 1980, counsel for the Milk Distributors Association of the Philadelphia Area, Inc.[4] filed

---

[1] Pending such redetermination, we ordered the board to maintain price differentials at levels fixed in General Order No. A-821 (July 1978).

[2] *See* 13 Pa. B. 1139 (1983) ; 12 Pa. B. 4296 (1982).

[3] The board has made the effective date of that order concurrent with the effective date of a new price order for the newly constituted Area 1.

[4] Its members then included Abbotts Dairies, Breuninger Dairies, Chestnut Hill Dairy, Pennbrook Foods, Quaker Maid Dairy

a petition with the board, seeking review of the minimum prices then in effect for Zone 1.[5] The board granted that review request and issued a notice of hearing dated February 26, 1981, approximately one month after the board issued the minimum price increase order for Zone 2 (A-837).

The board conducted seven days of hearings, from June 8 to June 22, 1981. As in *Lily Penn II*, Carl Herbein, a certified public accountant, was the principal witness for the milk dealers and Dr. Richard Stammer, an associate professor of agriculture economics at Rutgers University, the primary witness for Lily Penn. The board also heard testimony from Distributors Association staff vice-president Daniel F. Wettlin, III, management consultant Robert G. Havemeyer, the board's economics director Reed Miller, and the board's audit supervisor James Sullivan.

The parties filed post-hearing briefs during August and September of 1981, but the board took no action until after our Supreme Court denied the petition for appeal in *Lily Penn II*.

On the basis of our holding in *City of Pittsburgh v. Pennsylvania Milk Marketing Board*, 60 Pa. Commonwealth Ct. 422, 433 A.2d 561 (1981) *(City of Pittsburgh II)*, which mandates that non-board documents underlying exhibits be made available for examination, the board excluded the financial exhibits upon which Distributors Association witness Herbein relied in support of a Zone 1 minimum resale price increase. The board also concluded that the only other financial evidence of record—submitted by board employees— could "not justify a change in the presently established minimum prices."

Products, Inc., and Wawa Dairy, Inc.; according to the petition, those members distributed over fifty percent of the milk distributed in Zone 1.

[5] *See* General Order No. A-829.

A majority of the board, however, also refused to lower minimum resale prices for lowfat and skim milk, stating "that the record is devoid of evidence necessary to justify any change in the presently established minimum prices for Area 1, Zone 1. . . ."

Consumer member Olson dissented, describing the majority decision as an "attempt to negate the evidence by declaring it to be incompetent."

Lily Penn has requested reversal of Order A-847, insofar as it allegedly continues to impose unreasonably high minimum prices for lowfat and skim milk; neither dealers' association has interposed an appeal. In the alternative, Lily Penn has asked us to vacate Order A-847 and remand with instructions to reduce or terminate those prices.

## Scope of Review

The setting of minimum prices for skim milk is a discretionary function committed to the expertise of the board. *See* section 802 of the Milk Marketing Law[6] (the Act). Section 802, however, does not refer to lowfat milk, presumably because that product was unknown when the General Assembly drafted minimum price legislation in the 1930's.[7]

We note, however, that skim milk and lowfat milk are similar; processors produce both products by removing virtually all of the butterfat content from raw milk.[8] Bearing in mind that "legislative intent must be read in the light of changed circumstances," *City*

---

[6] Act of April 28, 1937, P.L. 417, *as amended*, 31 P.S. §700j-802.

[7] The General Assembly has not addressed the issue since; the Act's definition of "Milk"—amended in 1965 and in 1968—still makes no reference to lowfat milk. *See* 31 P.S. §700j-103.

[8] Whole milk must contain at least 3.25% butterfat content, although the amount of butterfat in raw milk varies seasonally from 3.5% to 3.8%. Lowfat milk generally has a butterfat content of anywhere from .05% to 3.25%, while skim milk has less than .05% butterfat.

*of Pittsburgh v. Pennsylvania Milk Marketing Board,*
1 Pa. Commonwealth Ct. 300, 311, 275 A.2d 115, 121
(1971) *(City of Pittsburgh I),* we conclude that the
setting of minimum prices for lowfat milk is also a
discretionary function committed to board expertise.

We may only review the discretionary acts of public officials upon a showing of fraud, bad faith, capricious action, or abuse of discretion, *Snelling v. Department of Transportation,* 27 Pa. Commonwealth Ct. 276, 286, 366 A.2d 1298, 1304 (1976); we have applied that standard to board decisions in the past. *Lily Penn II,* 62 Pa. Commonwealth Ct. at 605, 437 A.2d at 490; *Lily Penn I,* 42 Pa. Commonwealth Ct. at 97, 400 A.2d at 663-64. To constitute an abuse of discretion, the board must have based its conclusion upon wholly arbitrary grounds, in capricious disregard of competent evidence. *Lily Penn I,* 42 Pa. Commonwealth Ct. at 97, 400 A.2d at 664.

Here, the board abused its discretion by a capricious disregard of the only material cost evidence pertinent to the issue of lower minimum prices for lowfat and skim milk. *Cf. Lily Penn II.* The board also committed an error of law by improperly imposing a burden on Lily Penn to project dealer profits resulting from lowered minimum prices. *See* 2 Pa. C. S. §704 (scope of review).

Section 801 of the Act pertinently provides that "[a]ll provisions of all price-fixing orders of the board shall be presumed to be valid, and the burden of proving any invalidity of any provisions thereof shall be upon the person asserting the same." 31 P.S. §700j-801. In construing section 801, our Supreme Court has held that, for a complainant to overcome this rebuttable presumption, it must come forward with sufficient documented proof of a change of conditions in the relevant market. *Milk Control Commission v. United Retail Grocers,* 361 Pa. 221, 224, 64 A.2d

818, 820 (1949) (previous minimum price orders shall be assumed to be fair, just and reasonable in absence of proof of change in factual circumstances; Act contemplates reexamination when conditions change).

## The Record
### The Differentials

Here, to substantiate its claim for a reduction in, or removal of, lowfat and skim milk minimum prices, Lily Penn offered the testimony of expert witness Stammer, who determined that, because of the lower butterfat content in these products, the average or normally efficient milk dealer in Zone 1 was experiencing a raw product cost savings not reflected in current minimum price margins.[9] Specifically, Dr. Stammer concluded that, based upon a butterfat differential of $1.69 per pound, the dealer's net cost per gallon for lowfat and skim milk was less than its cost for whole milk, as follows:

| | |
|---|---|
| 2% Lowfat Milk | 18.08 cents less per gallon |
| 1% Lowfat Milk | 32.62 cents less per gallon |
| Skim Milk | 39.88 cents less per gallon |

As we noted above, however, the Zone 1 minimum prices for 2% lowfat, 1% lowfat, and skim milk are only eight cents, twelve cents, and twenty-four cents per gallon less than the minimum resale price for whole milk.

To arrive at his conclusion, Dr. Stammer documented and analyzed (1) the difference in raw product cost between whole milk, on the one hand, and lowfat or skim milk, on the other, and (2) any "incre-

---

[9] In reality, Lily Penn first raised the issue of changed circumstances in Area 1 during 1979 Area 1 hearings. At that time, Dr. Richard Aplin testified that, because of dramatic increases in the value of butterfat, existing minimum price differentials for lowfat and skim milk, which the board had not changed for almost a decade, were inadequate. During that same decade, sales of lowfat and skim milk products increased dramatically.

mental"[10] processing or surplus cream disposal costs generated when a dealer processes a gallon of lowfat or skim milk. Obviously, the latter two costs would offset, to some degree, the raw product cost savings experienced by dealers.

### Raw Product Cost Difference

In computing the difference in raw product cost between whole milk and lowfat or skim milk, Dr. Stammer—as in *Lily Penn II*—relied upon the butterfat differential, which, set by federal order, expresses the difference in value between a pound of butterfat and a pound of skim in raw milk.[11] When Dr. Stammer prepared his quantitative analysis, the butterfat differential was $1.69 per pound.

As in *Lily Penn II*, Dr. Stammer multiplied the butterfat differential by a conversion factor to determine the per gallon raw product cost savings from lower butterfat content in skim and lowfat milk. The conversion factor represents the difference in butterfat per hundredweight (cwt.) between whole milk and the defatted milk product, divided by the number of gallons in a hundredweight of milk, or 11.628.[12]

[10] Dr. Stammer explained his use of the word "incremental" as follows:

Everytime I use incremental in this analysis I am making a comparison between the particular low fat product I am talking about and whole milk. So if I am talking about incremental processing costs for one percent low fat, *I am talking about the additional processing costs that would be incurred above that which is incurred for 3.25 percent milk.* (Emphasis added.)

[11] As Dr. Stammer and board member Olson noted, the principal non-fluid use of butterfat in raw milk is in the manufacture of butter; therefore, the butterfat differential is determined by referring to the average wholesale price of a specific grade of butter in the regional Chicago market.

[12] *See* footnotes 11 and 12 in *Lily Penn II*, 62 Pa. Commonwealth Ct. at 610, 437 A.2d at 492, for an illustration of Dr. Stammer's computational methodology.

As Lily Penn notes in its brief, no board staff member or association witness challenged Dr. Stammer's calculations or conclusions at the hearings.

## Standardization of Costs

The amount of butterfat in raw milk varies seasonally from between 3.5% and 3.8%; the standard butterfat content in whole milk is 3.25%. Therefore, to achieve the desired butterfat level, a typical fluid milk processing plant must use a separator, for whole milk as well as for the lowfat products.

For a plant to obtain the butterfat level desired, the separator removes cream from the raw milk; cream contains approximately 40% butterfat and 60% skim milk. As indicated in Dr. Stammer's study of the incremental cost of processing lowfat milk,[13] a plant needs 6.1 lbs./cwt. (or 6.1%) more raw milk to produce a gallon of 1% lowfat milk than to produce a gallon of 3.25% whole milk.

That study also reveals that the typical plant processes whole and lowfat milk identically, with the same equipment and manpower. Therefore, because a plant must separate more cream per unit from the raw product to produce a gallon of lowfat milk, one incremental cost incurred by a processor is the result of running the separator slightly longer.

Based upon labor, overhead, and depreciation costs associated with these extra spins of the separator, Dr. Stammer calculated that the incremental cost of processing 1% lowfat milk equals one-half a mill (5/100 of one cent) per gallon and, therefore, "should be disregarded in the determination of appropriate minimum price differentials for low fat fluid milk products."[14] No other expert witness challenged that conclusion.

---

[13] Petitioner's Exhibit B-21.

[14] *Id.*

## Surplus Cream Disposal Costs

As noted above, the record established that a typical processing plant needs more raw milk to produce lowfat milk than to produce 3.25% "whole" milk. Because the extra raw milk is extracted as cream, the question, then, is whether a dealer incurs incremental costs in disposing of the cream which he cannot use in-plant, *i.e.*, the surplus.

Dr. Stammer,[15] association witness Herbein,[16] and board audit supervisor Sullivan[17] each testified that, because of a ready market for cream, Zone 1 milk dealers had no problem using or selling cream generated by production of lowfat milk products. Dr. Stammer also explained that if a dealer had no in-plant use for the cream, any incremental disposal cost on the

---

[15] Dr. Stammer testified as follows:

Q. Doctor, in the course of your investigation did you ascertain whether or not there is a ready market accessible to dealers selling in Area 1, Zone 1, to dispose of the cream generated?

A. Yes, I did, sir.

Q. Did anybody indicate that there was any significant problems of disposing of surplus cream in this marketing area during last year?

A. No, they didn't.

[16] Mr. Herbein testified:

Q. And to the extent that the particular dealer has use for the cream generated, he will use it in his plant; correct?

A. He would use it in his plant.

. . . .

Q. And, if not, it's disposed of on the open market; correct?

A. It is disposed of on the open market.

[17] Mr. Sullivan testified:

A. Now, we often hear of the problem of surplus cream and how that the surplus cream which is used in controlled products gets sold as non-controlled and affects the sales allocation and the administrative allocation.

open market would amount to less than three mills per gallon of 1% lowfat milk produced.

To arrive at that conclusion, uncontroverted by any witness at the hearings, Dr. Stammer examined the difference between what surplus cream costs the average dealer to produce and what he can sell it for on the market.

When a fluid milk processor faces a seasonal or temporary over-supply of cream, he can dispose of it on the spot market. Market prices of surplus cream are quoted on a dollars per pound of butterfat basis. Thus, as revealed by his testimony, Dr. Stammer first determined the cost of a pound of class II butterfat, which consists of the butterfat differential per pound plus the cost of class II skim milk per pound.

Dr. Stammer then consulted the Dairy Market News for the Middle Atlantic Marketing Area to determine the monthly average price paid per pound of butterfat, which is the price "as delivered" to the buyer.

To determine what price a dealer disposing of surplus cream would actually realize, Dr. Stammer adjusted the average market price to account for (1) transportation costs from the plant to the buyer's market, (2) shrinkage within the transportation pro-

---

What we have to examine in these particular dealers, we have one dealer who sells all of its cream to an organization that does nothing but bottle cream and it buys all its packaged cream from the same organization. So, it is hard to believe that the one organization is losing money selling cream to the same organization it buys the cream back from.

The second organization sells cream to the same bottler, but it does not buy from that bottler. It buys from an affiliated company. It buys its cream from one of its affiliates.

The third dealer buys more cream than it sells.

cess,[18] and (3) the difference between the way Daily Market News quotes the price of cream—on a butterfat basis—and the skim portion of that cream not reflected in the market quotation, *i.e.*, the skim replacement cost. Dr. Stammer's adjustments thus yielded a net market price for surplus cream paid to the average dealer on a per pound of butterfat basis.

Ultimately, Dr. Stammer determined that an average dealer disposing of surplus cream in 1980 would have suffered a yearly average loss of .013 cents per pound of butterfat or an additional .0028 cents per gallon extra expense for having made lowfat, rather than whole, milk.

As in the Zone 2 hearings, Dr. Stammer stated that the best way to compute the price differentials would be to multiply the conversion factors for 2%, 1% and skim milk by the current federal order butterfat differential, published monthly, and to subtract one cent from that figure to reflect any incremental processing or disposal costs. *Cf. Lily Penn II*, 62 Pa. Commonwealth Ct. at 612-13, 437 A.2d at 493.

### The Board Decision

The board's opinion expresses the majority's capricious disregard of the evidence detailed above by stating:

> What is not considered anywhere in the testimony is the cost of the extra raw milk necessary to product [sic] a gallon of low fat milk or skim milk. Consideration of this factor is necessary in view of the fact that separators do not remove 100% butterfat, but rather 40% cream which is 40% butterfat and 60% non-fat milk material. Obviously, it is necessary to start with more than a gallon of raw milk to arrive at

---

[18] Dr. Stammer testified that a dealer would incur these costs in disposing of cream, regardless of whether or not he generated the cream in the processing of whole milk or lowfat milk products.

a gallon of either low fat or skim milk. It is this factor, and especially the 60% non-fat milk material contained in the cream which is removed that is not dealt with in the record.

The board also insisted that "the record contains no evidence to indicate" the "effects upon revenue and return which would be created" and "necessary adjustments to other prices" that dealers allegedly would have to make if the board ordered a reduction in minimum resale prices for lowfat and skim milk.

### Raw Milk/Skim Milk Replacement Costs

The Stammer evidence, however, did expressly consider the cost of extra raw milk needed to produce lowfat products, as our foregoing review of the testimony on surplus cream disposal costs has revealed.

Moreover, in footnote 5 of his Table II (fn. 5) and in his above-noted testimony, Dr. Stammer expressly adjusted his butterfat disposal cost calculations to account for the 60% skim material found in cream. The contrary implication in the majority opinion of the board (as quoted verbatim above) is clearly unfounded.

Citing *Rozauski v. Glen Alden Coal Co.*, 165 Pa. Superior Ct. 460, 69 A.2d 192 (1949); *Nickolay v. Hudson Coal Co.*, 164 Pa. Superior Ct. 550, 67 A.2d 828 (1949), and other ·federal court decisions[19] for the proposition that an administrative agency may draw upon its own expertise to consider but reject uncontradicted testimony of record, the board contends that it justifiably discounted Dr. Stammer's cost testimony. We must conclude, however, that the board did not consider his testimony in full, but ignored it.

---

[19] *Market Street Railway Co. v. Railroad Commission of the State of California*, 324 U.S. 548, *reh'g denied*, 324 U.S. 890 (1945); *Kwasizur v. Cardillo*, 175 F.2d 235 (3rd Cir. 1949); *Lydia E. Pinkham Medicine Co. v. Commissioner*, 128 F.2d 986 (1st Cir. 1942).

No authority justifies an administrative board in using its off-the-record expertise as a substitute for evidence on the record, as the board here has sought to do by its discussion of "Pearson's Square."[20] An administrative adjudication cannot be supported by off-the-record material which interested parties have had no opportunity to counter.

## Revenue Considerations

Section 801 of the Act states that "[t]he board shall base all prices upon all conditions affecting the milk industry in each milk marketing area, including the amount necessary to yield . . . a reasonable return to the milkdealer or handler." 31 P.S. §700j-801.

In discussing rate of return, Dr. Stammer relied upon an updated version of a U.S. Department of Agriculture survey used in the *Lily Penn II* hearings. The survey, covering a period from 1972-1980, indicated that, for the last five years, the average return on pre-tax net sales for a nationwide cross-section of thirty fluid milk processors was 2.7%. Considering the lower risk element in a price-controlled area such as Pennsylvania, Dr. Stammer concluded that the amount necessary to provide a reasonable return to milk dealers in Zone 1 should not exceed 2.5% of net sales.

On the issue of profits, the Distributors Association relied primarily upon the testimony of Mr. Herbein, who essentially offered his audit of the 1980 operating statements and 1981 cost and revenue projections of three member dealers with processing plants in Zone 1. However, because that association refused to provide Lily Penn's counsel with access to the materials which Mr. Herbein used to prepare his testimony and exhibits, the board—on the basis of our

---

[20] The Pearson's Square analysis, offered by the board for the first time in its brief, apparently constitutes a substantial part of the board's basis for rejecting the Stammer analysis.

*City of Pittsburgh II* decision—excluded his audits from the record.

Based upon a board staff audit of those same 1980 operating statements, Audit Supervisor Sullivan testified that the three dealers realized a combined operating profit of nearly $1,350,000 from the sale of controlled products and net operating profit margins of 3.7%, 3.6% and 1.1%[21] on controlled product sales.

The board made no findings pertinent to the issue of current "revenue and return" margins. Instead, it discounted Dr. Stammer's testimony because he did not determine what effect the lowering of minimum prices might have upon *future* dealer profits. The Act imposes no such burden on a party seeking to reduce or eliminate minimum prices.

Section 801's burden of proof provision required Lily Penn to demonstrate that *present* market circumstances warrant a reduction in minimum price margins; Lily Penn met that burden. If we assume that a downward adjustment in minimum prices could have a negative effect on dealer profit,[22] the burden to come forward with such speculative evidence would have shifted to the Distributors Association, which had the most to lose by its silence and which had control of the revenue information necessary to demonstrate potential injury by a reduction in, or elimination of, those

---

[21] These three dealers were presented as a representative cross-section of the market, *see Lily Penn II*, 62 Pa. Commonwealth Ct. at 601, 437 A.2d at 488-89.

[22] As Lily Penn notes in its brief, a reduction in minimum dealer prices does not necessarily result in lower returns for average or normally efficient dealers; the board only establishes minimum resale prices, not market prices. As Dr. Stammer testified, "[w]e are setting minimum price and the dealers are free to set any price above that price based upon market conditions." Moreover, as Mr. Herbein acknowledged, over-minimum pricing at the wholesale level has been a significant condition affecting the milk industry in Area 1.

prices. *Cf. General Electric Corp. v. Human Relations Commission,* 469 Pa. 292, 306-07, 365 A.2d 649, 657 (1976) (pragmatic considerations dictate that party with access to facts should bear burden of proof); *Gateway Coal Co. v. Workmen's Compensation Appeal Board,* 36 Pa. Commonwealth Ct. 608, 612, 388 A.2d 1122, 1124 (1978) (burden of proof allocated on basis of which party has ready access to relevant information). That association, however, came forward with no admissible evidence to that effect. Moreover, the record demonstrates that the association's and the board's refusal to provide Lily Penn with access to pertinent price information would have made it difficult, if not impossible, for Dr. Stammer to make Zone 1 dealer profit projections.

## Relief

Generally, an appellate court will not consider facts arising after a trial court or administrative tribunal has rendered its decision. *See, e.g., Appeal of Martin,* 23 Pa. 433 (1854). A court may depart from this principle, however, when "by so doing, it can shorten litigation and best subserve the ends of justice." 5B C.J.S. Appeal & Error §1842 (1958); P.L.E. Appeals §511.[23]

Here, after issuing Order A-847, the board issued Order A-848, reconsolidating Zones 1 and 2 into Area 1. By failing to hold redetermination hearings for Zone 2 and by then abolishing that zone, the board has

---

[23] *See, e.g., White v. Old York Road Country Club,* 318 Pa. 569, 179 A. 434 (1935); *Blanchette v. Connecticut General Insurance Co.,* 419 U.S. 102 (1974); *Aurora Enterprises, Inc. v. Department of Business Regulation,* 395 So.2d 604 (Fla. Dist. Ct. App. 1981); *Dorman v. Young,* 80 Idaho 435, 332 P.2d 480 (1958); *Estate of Howard,* 67 Ill. App. 3d 595, 385 N.E.2d 120 (1978); *Cunningham v. Hiles,* 402 N.E.2d 17 (Ind. Ct. App. 1980); *International Union of Operating Engineers v. J. A. Jones Construction Co.,* 240 S.W.2d 49 (Ky. Ct. App. 1951); *Fullilove v. U. S. Casualty Co. of New York,* 129 So.2d

made it clear that it does not intend to follow our *Lily Penn II* order.

Reluctantly, we must conclude that the board's course of action, whether by design or not, has the effect of thwarting implementation of this court's *Lily Penn II* order, as to Zone 2, now abolished. Having concluded that the board has abused its discretion with respect to lowfat and skim milk prices in the former Zone 1, our normal remedy would be simply to remand for further proceedings on that question, directing the board to give due consideration to the evidence described. However, the board's approach to the Zone 2 issue clearly indicates that similar inaction with respect to lowfat and skim milk prices in Zone 1 could result in maintaining those prices at their present levels, contrary to the evidence capriciously disregarded in this record. Therefore, in order to have effect, the remedy here must place upon the board a mandate to proceed with action rather than inaction. Therefore, we will vacate Order A-847 and direct the elimination of the contested minimum prices for lowfat and skim milk.

Moreover, we would be ignoring reality if we limited relief to the residents of a marketing zone (Zone 1) which no longer separately exists. Therefore, because the board has not rectified its abuse of discre-

816 (La. Ct. App. 1961) ; *Redwood Hotel v. Korbien*, 197 Md. 514, 80 A.2d 28 (1951) ; *Enterprise Wall Paper Mfg. Co. v. Gordon*, 312 Mass. 1, 42 N.E.2d 809 (1942) ; *Rutter v. King*, 57 Mich. App. 152, 226 NW.2d 79 (1974) ; *Johnson v. Brown*, Mo. , 233 S.W. 715 (1921) ; *Haire v. Wagner*, 13 N.Y.S.2d 68, 257 App. Div. 970 (1939) ; *Schafer v. Faylor*, 74 Ohio App. 533, 60 N.E.2d 339 (1944) ; *Rudnicki v. Town of Valley Brook*, 424 P.2d 973 (Okla. 1967) ; *Lais v. City of Silverton*, 82 Or. 503, 162 P. 251 (1971) ; *Fauske v. Dean*, 78 S.D. 310, 101 N.W.2d 769 (1960) ; *Ward v. Charlton*, 177 Va. 101, 12 S.E.2d 791 (1941) ; *Manion v. Pardee*, 79 Wash.2d 1, 482 P.2d 767 (1971) ; *Gillen v. John H. Parker Co.*, 170 Wis. 264, 174 N.W. 546 (1919) ; *Takahashi v. Pepper Tank & Contracting Co.*, 58 Wyo. 330, 131 P.2d 339 (1942).

tion evident in the Zone 2 proceedings pursuant to *Lily Penn II,* because it has committed a similar abuse of discretion and error of law in the present proceedings, and because its consolidation of the two zones makes area-wide relief more practical, logical, and effective than single-zone relief, our direction to eliminate minimum prices for lowfat and skim milk must be applicable to all of Area 1.

Consequently, no minimum prices shall exist for lowfat and skim milk products in that area until the board duly completes a minimum-price-fixing proceeding for those Area 1 products under sections 801 and 802 of the Act. Of course, to avoid duplication in the presentation of evidence, the board may incorporate the present record into any record developed in a future proceeding.

### Order

Now, February 13, 1984, the general order of the Pennsylvania Milk Marketing Board, No. A-847, is vacated and this case is remanded to the board with a direction to eliminate immediately all minimum resale prices for lowfat and skim milk in Milk Marketing Area 1.

Jurisdiction relinquished.

---

CONCURRING AND DISSENTING OPINION BY JUDGE MACPHAIL:

I concur with the majority's excellent discussion of the substantive issues in this case but I feel compelled to dissent to the remedy they have fashioned. Although I am frustrated and troubled by the response of the Milk Marketing Board to our previous orders, I do not believe this Court can or should take it upon itself to eliminate minimum milk prices. I would remand to the Milk Marketing Board for immediate appropriate action in accord with this and our previous decisions.